### UNITED STATES DISTRICT COURT FOR
### THE NORTHERN DISTRICT OF WEST VIRGINIA

**MELVIN CURTIS,**

      **Plaintiff,**

**v.**                                        **Civil Action No. 1:17cv39**
                                                     **(Judge Kleeh)**

**J. CARAWAY, Regional Director;**
**CHARLES WILLIAMS, ex-Warden;**
**MICHAEL WEAVER, Health Service**
**Administrator; REBECCA GROVE,**
**Assistant Health Service Administrator;**
**and EDDIE ANDERSON, D.O.,**

      **Defendants.**

### REPORT AND RECOMMENDATION

### I. Procedural History

On March 8, 2017, the *pro se* Plaintiff, a former inmate, then-incarcerated at FCI Gilmer[1]

in Glenville, West Virginia, initiated this case by filing a <u>Bivens</u> civil rights complaint, raising

both <u>Bivens</u> and Federal Tort Claims Act ("FTCA") claims.[2] ECF No. 1. The Plaintiff was granted

permission to proceed as a pauper on March 15, 2017 and directed to pay an initial partial

---

[1] On or about April 6, 2018, Plaintiff was released to a halfway house [see ECF No. 57], and on October 26, 2018, per the BOP's online inmate locator, he was released from BOP custody.  See < https://www.bop.gov/inmateloc/ > He is now residing in Brooklyn, New York. ECF No. 66.

[2] This case was originally filed on December 13, 2016 as a combined <u>Bivens</u> and FTCA action in the Eastern District of Kentucky as Case No. 6:16cv291. In that action, Plaintiff named as defendants a number of BOP employees from USP McCreary in Pine Knot, Kentucky, as well as three of the Defendants in this action: Weaver, Grove, and Anderson, who are BOP employees at FCI Gilmer, in Glenville, West Virginia.

    On February 7, 2017, the <u>Bivens</u> claims against Defendants Weaver, Grove, and Anderson were severed and terminated from Eastern District of Kentucky Case No. 6:16cv291 action and the complaint as to them was transferred to this district on February 7, 2017, where it was docketed as Case No. 1:17cv19.  Because that complaint was not on this district's form, pursuant to a Notice of Deficient Pleading and Intent to Dismiss, Case No. 1:17cv19 was dismissed on March 16, 2017, after Plaintiff re-filed it as the instant case on this district's court-approved form. However, when Plaintiff refiled, he added two new <u>Bivens</u> defendants, J. Caraway and Charles Williams.

filing fee ("IPFF"). ECF No. 7. Plaintiff paid the IPFF on April 10, 2017. ECF No. 9.  By Order entered June 7, 2017, Plaintiff was notified of the potential consequences of pursuing both a FTCA action and a Bivens civil rights action, and the Clerk of Court provided him with a copy of a court-approved form FTCA complaint. ECF No. 12. On June 16, 2017, Plaintiff elected to proceed with both actions and filed his court-approved FTCA form complaint. ECF Nos. 15, 16. On September 15, 2017, this case was reassigned from Magistrate Judge James E. Seibert to Magistrate Judge Michael J. Aloi. On November 28, 2017, Plaintiff was directed to proceed solely on the FTCA action. ECF No. 20.

By Order entered November 29, 2017, the Defendant United States of America was directed to answer on Plaintiff's FTCA claims.  ECF No. 21.  For reasons appearing to the Court, by Order entered December 4, 2017, the November 28, 2017 Order directing Plaintiff to proceed solely on the FTCA action was vacated.  ECF No. 26.  The undersigned conducted a preliminary review of the Bivens complaint, determined that summary dismissal was not warranted at that time, and directed the Bivens Defendants to answer the complaint. ECF No. 27.

On January 11, 2018, Plaintiff moved for appointed counsel; by Order entered the next day, the motion was denied.  ECF Nos. 40, 41. On January 18, 2018, the Defendants filed a motion to temporarily stay consideration of Plaintiff's Bivens claims pending the resolution of his FTCA claims, or alternatively, for an extension of time in which to answer. ECF No. 43. By Order entered January 19, 2018, Defendants' motion was construed as one for an extension of time and granted. ECF No. 44.  On March 9, 2018, Defendants filed a Motion for leave to file excess pages in its consolidated response to Plaintiff's FTCA and Bivens complaints; by Order entered March 12, 2018, Defendants' motion was granted. ECF Nos. 46, 47.

On March 19, 2018, Defendants filed a Motion to Dismiss, or, Alternatively, Motion for Summary Judgment with a memorandum in support, attaching multiple exhibits, sworn declarations, medical records, and other documents. ECF Nos. 49, 50. Because Plaintiff was proceeding *pro se*, on March 20, 2018, a <u>Roseboro</u> Notice issued. ECF No. 51. By Order entered March 20, 2018, the copies of Plaintiff's medical records produced by Defendants were sealed. ECF No. 53. On April 10, 2018, Plaintiff moved for an extension of time to respond; by Order entered the next day, Plaintiff's motion was granted. ECF Nos. 58, 59.  On July 12, 2018, Plaintiff filed his response in opposition to the Defendants' dispositive motion and a motion for an extension of time in which to file a screening certificate of merit. ECF Nos. 60, 61. By Order entered on July 13, 2018, Plaintiff's motion for an extension of time to file the screening certificate of merit was granted.  ECF No. 62. On July 17, 2018, Defendants moved for reconsideration of the order granting Plaintiff an extension of time in which to file the screening certificate of merit. ECF No. 63.  On August 28, 2018, Plaintiff filed a letter from an orthopedic surgeon regarding his right shoulder injury. ECF No. 65.

By Miscellaneous Case Order entered on December 1, 2018, this case was reassigned from United States District Judge Irene M. Keeley to United States District Judge Thomas S. Kleeh.

## II. <u>Factual Background</u>

At the time Plaintiff filed his complaint, he was serving a 235 month sentence imposed in the United States District Court for the Eastern District of New York on April 23, 2008, for cocaine trafficking. <u>See</u> Public Information Inmate Data, ECF No. 50-1 at 6. He arrived into BOP custody on October 21, 2008. Declaration of Lori Trump ("Trump Decl."), ECF No. 50-1, ¶ 5 at 2. Plaintiff was incarcerated at USP McCreary, in Pine Knot, Kentucky, from September 10, 2014 until he

was transferred on April 8, 2015. Id., ¶ 6 at 2. He arrived at FCI Gilmer on April 17, 2015. Id. As noted *supra*, he has since been released from custody.

### III. Contentions of the Parties

#### A. The FTCA Complaint

Plaintiff asserts claims of negligence and medical malpractice, arising out of the delay in diagnosis and repair of his torn right rotator cuff while he was incarcerated at FCI Gilmer. ECF No. 16 at 7. He contends that he is entitled to the "common knowledge" exception of W.Va. Code § 55-7B-6(c) regarding at least part of his claims. Id. at 8. He further contends that as a result of the acts of the federal employees involved, he sustained permanent physical and mental injuries, will require medical care for the rest of his life with associated costs, and will suffer future loss of earnings. Id. at 11.

Plaintiff asserts that he filed a Standard Form 95 administrative tort claim on October 5, 2016 [see ECF No. 1-1 at 9] and received an acknowledgement letter with the assigned Claim Number TRT-MXR-2016-05587. Id. at 4; see also December 7, 2016 administrative tort denial letter, ECF No. 1-1 at 18.

As relief, Plaintiff requests "at least" $1,000,000.00[3] in compensatory damages. ECF No. 1 at 11.

#### B. The Bivens Complaint

In the Bivens complaint, Plaintiff raises claims of deliberate indifference to serious medical needs in violation of his Eighth Amendment rights, arising out of the delay in medical treatment for his torn rotator cuff.  ECF No. 1 at 7 - 10.   He contends that the delay caused him permanent residual injury in his right shoulder which will require lifelong medical treatment.  Id. at 9.

---

[3] Plaintiff's December 7, 2016 Administrative Tort Denial letter noted that "[y]ou are seeking $1,750,000 as compensation for your alleged injuries and pain and suffering." ECF 50-1 at 9.

Plaintiff maintains that he has exhausted his administrative remedies with regard to his claims. Id. at 4 - 5.

As relief, he requests compensatory damages in the amount of $1,000,000.00 jointly and severally from Defendants Caraway, Williams, Weaver, Grove, and Anderson for his physical and emotional injuries, and punitive damages in the amount of $250,000.00 individually against Caraway, Williams, Weaver, Grove, and Anderson. Id. at 10.

Plaintiff attaches a memorandum in support of his claims, titled "Resubmit Supplemental/Amended Complaint to Bring Federal Tort Claim Act Claim." ECF No. 1-1. Included with it are copies of various pages of medical records; a copy of his Administrative Tort Claim Standard Form 95; a copy of his December 7, 2016 Administrative Tort Claim denial letter; several emails to BOP Health Services staff; and copies of some of his grievances. See ECF No. 1-1 at 9 - 43.

## C. Defendants' Consolidated Motion to Dismiss, or Alternatively, Motion for Summary Judgment

Defendants contend that Plaintiff's FTCA and Bivens complaints should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, and pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim. Alternatively, they contend they are entitled to summary judgment granted in their favor, because

1) Plaintiff's Bivens complaint is not justiciable because it is barred by the Kentucky FTCA judgment, which addressed identical legal and factual claims, and dismissed his complaint there with prejudice [ECF No. 50 at 13 - 20];

2) even if Plaintiff's Bivens allegations were not wholly barred, he has failed to adequately plead or establish viable Bivens claims, because

i) Plaintiff has not identified any defendant who is subject to Bivens liability, because

a) Defendant Grove is a United States Public Health Service officer, and therefore is absolutely immune from liability [id. at 21];

5

b) he has not pled the required particularized personal or supervisory involvement necessary to support <u>Bivens</u> claims against any of the individual defendants [<u>id.</u> at 22 – 24]; and

c) Plaintiff's <u>Bivens</u> complaint fails to establish any cognizable constitutional claim and therefore, all of the individual <u>Bivens</u> defendants are entitled to qualified immunity. <u>Id.</u> at 24 – 25.

ii) Plaintiff has not pled or established that any <u>Bivens</u> defendant was deliberately indifferent to his medical needs. <u>Id.</u> at 25 – 28.

3) Plaintiff's FTCA complaint is not justiciable or cognizable, because

a) the United States District Court for the Eastern District of Kentucky previously dismissed Plaintiff's FTCA lawsuit because he failed to establish that the employees of the United States negligently treated his shoulder injury at both USP McCreary and FCI Gilmer. Therefore, Plaintiff is precluded from litigating the same factual issues and legal claims in this FTCA lawsuit. <u>Id.</u> at 28 – 29.

b) Even if Plaintiff's FTCA action is not barred by the Kentucky FTCA judgment, Plaintiff still fails to present a viable medical negligence or malpractice claim, because he did not comply with the mandatory pre-suit requirements of the West Virginia Medical Professional Liability Act ("WVMPLA"). <u>Id.</u> at 29 – 32.

Defendants concede that Plaintiff administratively exhausted both his <u>Bivens</u> and his FTCA allegations. ECF No. 50 at 9.

**D. <u>Plaintiff's Response in Opposition</u>**

Plaintiff reiterates his claims and arguments and attempts to refute the Defendants arguments on the same. ECF No. 60. He attaches a sworn affidavit, attesting to what a witness to his June 2, 2016 orthopedic visit would testify, and describing the status of his shoulder. ECF No. 60-1.

**E. <u>Defendants' Motion to Reconsider Order Granting Additional Time to File a Screening Certificate of Merit</u>**

Defendants argue that a screening certificate of merit is a prerequisite to filing suit against a medical provider, and that by seeking additional time in which to provide a screening certificate

of merit after having already filed suit, Plaintiff is "essentially seeking to revive a procedurally defunct medical negligence lawsuit by circumventing a mandatory prerequisite" that he was statutorily required to provide before filing suit.  ECF No. 63 at 1 – 3.

## IV. <u>Standard of Review</u>

### A. <u>Motion to Dismiss</u>

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct.1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Id.</u>

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. <u>Id.</u>; <u>see</u> <u>also</u> <u>Nemet Chevrolet, Ltd. v. Comsumeraffairs.com</u>, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." <u>Id.</u>

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed.R.Civ. P 8 (providing general rules of pleading), Fed.R.Civ. P. 9 (providing rules for pleading special matters), Fed.R.Civ. P. 10 (specifying pleading form), Fed.R.Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed.R.Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.) Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Plaintiff is representing himself, which requires the Court to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251(1976); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)(per curiam); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993).  Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30 (1st Cir. 2001)(cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated

8

into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462 (4th Cir. 2011).

## B. <u>Motion for Summary Judgment</u>

Summary judgment is appropriate where the depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c)(1)(A), (a). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207 (4th Cir. 2014). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248–52.

## V. <u>Applicable Law</u>

The function and structure of the FTCA bear discussion before turning to the merits of the Defendants' dispositive motion.

The United States enjoys sovereign immunity except to the extent that Congress has waived it by enacting the Federal Tort Claims Act, 28 U.S.C. §§2671, *et seq.* The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

28 U.S.C. §1346(b)(1) and (2) provide as follows:

> (b)(1) [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
>
> (2) No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or any agency, officer, or employee of the Government for mental or emotional injury suffered while in custody without a prior showing of a physical injury.

Generally speaking, therefore, the FTCA confers subject matter jurisdiction to the District Courts over negligence actions against the United States. In order to maintain a case against the United States under the FTCA, the plaintiff must demonstrate that his action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the state in which the action accrued. Therefore, under West Virginia law, which applies under the FTCA, the plaintiff in a negligence action bears the burden of proof by a preponderance of the evidence to demonstrate the applicable standard of care, deviation

from that standard and a causal connection between the deviation and plaintiff's injury. See

Judy v. Grant County Health Dep't., 210 W.Va. 286, 291 - 92, 557 S.E.2d 340, 345 - 46 (2001).

Due to its sovereign immunity, "[n]o action lies against the United States unless the

legislature has authorized it." Wood v. United States, 845 F.3d 123, 127 (4th Cir. 2017) (quoting

Dalehite v. United States, 346 U.S. 15, 30 (1953)). Under the FTCA, Congress authorized such

claims "against the United States based on the negligence or wrongful acts or omissions of its

employees committed within the scope of employment." Id. (citing 28 U.S.C. §§ 1346(b)(1), 2671-

2680).

Congress limited the scope of this waiver, however, "to a certain category of claims." Kerns

v. United States, 585 F.3d 187, 194 (4th Cir. 2009) (quoting FDIC v. Meyer, 510 U.S. 471, 475

(1994). Pursuant to 28 U.S.C. § 1346(b), claims under the FTCA must be made

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of
> property, or personal injury or death [4] caused by the negligent or wrongful act or
> omission of any employee of the Government [5] while acting within the scope of
> his office or employment, [6] under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance with the law of the
> place where the act or omission occurred.

Id. (quoting Meyer, 510 U.S. at 475) (alteration in original) (reasoning that whether the

defendant was acting in the scope of his employment is a jurisdictional issue). District courts

only have jurisdiction to hear those cases that fall within the definition of § 1346. Meyer, 510

U.S. at 477. For instance, because the FTCA directs the application of state law - "the law of the

place where the act or omission occurred" - constitutional torts are not cognizable under the

statute. Id.

The jurisdictional scope of the FTCA is further limited by various exceptions found at 28

U.S.C. § 2680. For example, the FTCA does not apply to claims "based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty on the party of a

federal agency or an employee of the Government." 28 U.S.C. § 2680(a). Other more discrete

areas to which the FTCA does not apply include "transmission of letters," "claims or suits in admiralty," and "the imposition or establishment of a quarantine." Id. § 2680(b), (d), (f).

As the Fourth Circuit has explained, choosing to proceed under the FTCA rather than a Bivens action is a calculated risk:

> In pursuing an intentional tort claim against a federal law enforcement officer, a prospective plaintiff may pursue two alternative avenues of relief. She may either pursue a constitutional claim against the officer directly under the Constitution, as recognized in Bivens, or she may file a tort claim under the FTCA. Should a plaintiff pursue the latter course, she runs the risk that her constitutional claim will be subject to the FTCA's "judgment bar" provision .
> . . .

Unus v. Kane, 565 F.3d 103, 122 (4th Cir. 2009). The FTCA's "judgment bar" states as follows:

> The judgment in an action under section 1346(b) of this title shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim.

28 U.S.C. § 2676. Therefore, when judgment is entered on FTCA claims, the plaintiff is barred from bringing Bivens claims "arising out of the same actions, transactions, or occurrences." Unus, 565 F.3d at 122 (quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 858 (10th Cir. 2005)).

However, every FTCA dismissal does not trigger the judgment bar. Courts consistently hold that the judgment bar does not apply when claims in an FTCA case are dismissed because they could not be pursued under the FTCA in the first place. See, e.g., Simmons v. Himmelreich, 136 S.Ct. 1843, 1850 (2016) ("The judgment bar provision . . . does not apply to the categories of claims in the 'Exceptions' sections of the FTCA."); Berryman v. Mullen, 2015 U.S. Dist. LEXIS 33435, *14 (N.D. W.Va. Mar. 9, 2018) (same); Will v. Hollack, 387 F. 3d 147, 155 (2nd Cir. 2004) ("[F]or the judgment bar to apply, the action must be a proper one for consideration under the

[FTCA].”); Donahue v. Connolly, 890 F. Supp. 2d 173 (D. Mass. 2012) (holding that, “because the statute of limitations is an absolute jurisdictional bar, the dismissal of the FTCA action does not bar the Bivens claims brought contemporaneously”); Addison v. Arnett, 2014 U.S. Dist. LEXIS 182904, *7, Graham, J.E. (S.D. Ga. May 30, 2014)(judgment bar inapplicable because prior dismissal was within the discretionary function exception to the FTCA, leaving the Court without subject matter jurisdiction) adopted by  Addison v. Arnett, 2015 U.S. Dist. LEXIS 33435, Wood, L.G. (S.D. Ga. Mar. 18, 2015).

## VI. <u>Analysis</u>

### A. <u>Whether the FTCA “judgment bar” precludes Plaintiff’s Bivens claims</u>

Plaintiff originally brought his claims regarding the alleged medical malpractice of three of the named West Virginia BOP Defendants in this action (Weaver, Grove, and Anderson) in the United States District Court for the Eastern District of Kentucky under two theories of liability, the FTCA and Bivens. Because the E.D. Kentucky lacked personal jurisdiction over Weaver, Grove, and Anderson, on February 7, 2017, the Bivens claims against them were severed and transferred to this Court. See ECF No. 50-5. However, despite the specific directive of 28 U.S.C. § 1402(b),[4] the E.D. Kentucky retained jurisdiction over the FTCA claims against both the

---

[4] A tort claim against the United States may be prosecuted “only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred.”  28 U.S.C. § 1402(b).  While Plaintiff was incarcerated in the E.D. of Kentucky at the time he first filed his FTCA claims, it appears that he was a resident of the Brooklyn, New York area, in the Eastern District of New York, where he was convicted, and where he has returned since being released from BOP custody.

While it appears that the Fourth Circuit has never ruled on the residency, under either the Social Security Act (“SSA”) venue provision or the general venue statute, 28 U.S.C. § 1391, of a prisoner incarcerated in a state different from the one in which he lived before conviction, the overwhelming weight of authority seems to indicate that prisoners remain residents of the jurisdiction in which they resided prior to their incarceration, at least for purposes of the general venue statute. Compare, e.g. Harris v. Lappin, 2008 WL 4371503, at *7 n.4 (N.D. W.Va. Sep. 22, 2008) (noting that the weight of authority has found that a prisoner's place of incarceration is not his residence for purposes of venue); see also Grinell Mut. Reinsurance Co. v. Ferando, 2009 U.S. Dist. LEXIS 107431, 2009 WL 4021351, *5 (C.D. Ill. 2009)(finding that venue did not lie in court's district because it was not appropriate to treat the defendant's place of incarceration as his residence for venue purposes); United States v. Lafaive, 2011 U.S. Dist. LEXIS 35183 (N.D. Ind. 2011)(residence has never been considered domicile for diversity purposes; the mere fact that the BOP has currently designated one to a facility in another state does not make the latter state the "district in which the debtor

13

Kentucky defendants and Weaver, Grove, and Anderson. Id. at 4. Ultimately, on December 6, 2017, the FTCA claims were dismissed with prejudice in a grant of summary judgment to the United States in the E.D. Kentucky on December 6, 2017, finding that Plaintiff "failed to establish a *prima facie* case of medical negligence under the law of either" Kentucky or West Virginia. ECF No. 50-6 at 12.

Here, the motion to dismiss filed by Defendants pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is premised on the argument Plaintiff's Bivens claims are precluded by the FTCA's judgment bar, incident to the Eastern District of Kentucky's decision on the FTCA litigated there. ECF No. 50 at 19.  The undersigned concludes that this argument is untenable because it misinterprets both the Eastern District of Kentucky's ruling on Plaintiff's FTCA claims and applicable law.

---

resides" for purposes of venue under §3004(b)(2); however, the presumption regarding domicile is rebuttable); Cohen v. United States, 297 F.2d 760, 774 (9th Cir. 1962)("One does not change his residence to the prison by virtue of being incarcerated there."); Bailey v. United States, 1992 U.S. Dist. LEXIS 17307, 1992 WL 331320, at *1 (D. Kan., Oct. 23, 1992)(finding that because the plaintiff offered nothing that reasonably supported an intention to be domiciled in the district of incarceration, his residence for venue purposes was his last chosen place of residence prior to his incarceration); see also Turner v. Kelley, 411 F. Supp. 1331, 1332 (D. Kan. 1976)("residence involves some choice, again like domicile, and . . . presence elsewhere through constraint has no effect upon it.") (citation omitted); Urban Industries, Inc., of Kentucky v. Thevis, 670 F.2d 981, 986 (11th Cir. 1982) (finding that the prisoner retained his Georgia residence even though incarcerated in Indiana); Loughry v. Colvin, 2014 U.S. Dist. LEXIS 140812, *2 (D. Md. 2014); Keys v. Dep't of Justice, 288 Fed. Appx. 863, 866 (3rd Cir. 2008) (per curiam) ("Prisoners generally are deemed to be residents, not of their place of incarceration, but of their place of domicile immediately before their incarceration."); Holmes v. United States Bd. of Parole, 541 F.2d 1243, 1248-49 (7th Cir. 1976) )("We see no reason for purposes of venue under section 1391 to ascribe to [the defendant] the residence of his district of incarceration rather than the district of his domicile.") *overruled on other grounds by* Arsberry v. Sielaff, 586 F.2d 37, 45 (7th Cir. 1978); Brimer v. Levi, 555 F.2d 656, 658 (8th Cir. 1977) (per curiam)(finding venue improper in district where prisoner is confined because presence is involuntary and temporary); Ellingburg v. Connett, 457 F.2d 240, 241 (5th Cir. 1972) (per curiam) (for purposes of venue, one does not change his residence to his place of incarceration); Flanagan v. Shively, 783 F. Supp. 922, 935 (M.D. Pa. 1992) *aff'd*, 980 F.2d 722 (3rd Cir. 1992)(inmate does not become resident of state by virtue of his incarceration); United States v. Kahane, 396 F. Supp. 687, 697 (E.D.N.Y. 1975); *and* Ott v. United States Bd. of Parole, 324 F. Supp. 1034, 1037 (W.D. Mo. 1971); *with* In re Pope, 580 F.2d 620, 622, 188 U.S. App. D.C. 357 (D.C. Cir. 1978) )(for general venue purposes a prisoner resides at his place of incarceration). *See generally* 14D Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3805 (4th ed. 2013); Stone v. United States Bd. of Parole, 360 F. Supp. 22, 23 (D. Md. 1973) (federal prisoner residing in Maryland but incarcerated in Pennsylvania remained a Maryland resident during his period of incarceration, again under the general venue statute).

First, the Eastern District of Kentucky's dismissal of Plaintiff's FTCA claims was a dismissal for Plaintiff's failure to obtain a screening certificate of merit to establish a *prima facie* case of medical negligence "under the law of either state." ECF No. 50-6 at 12.  Such a dismissal is a dismissal for lack of subject matter jurisdiction.  Therefore, the judgment bar simply cannot operate to preclude Plaintiff's related <u>Bivens</u> claims. Even though the Eastern District of Kentucky's dismissal order notes that the dismissal of both the <u>Bivens</u> and FTCA claims there was "with prejudice," the Eastern District of Kentucky's ruling in the FTCA case was erroneous in this regard. While the <u>Bivens</u> claims there were properly dismissed with prejudice, given that the Court dismissed the FTCA claims on jurisdictional grounds, dismissal of the FTCA claims should have been without prejudice. <u>S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC</u>, 713 F.3d 175, 185 (4th Cir. 2013) ("[A] court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits."); <u>see</u> <u>also</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)( "'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" (*quoting* <u>Ex parte McCardle</u>, 74 U.S. 506, 7 Wall. 506, 514, 19 L. Ed. 264 (1869)).

Therefore, contrary to Defendants' assertion that this matter should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, the undersigned finds that because the FTCA judgment bar does not preclude Plaintiff from raising his <u>Bivens</u> claims in this Court, Plaintiff's instant <u>Bivens</u> claims fall squarely within this Court's federal question subject matter jurisdiction.

**B. <u>Bivens</u>**

Liability in a Bivens action is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, in order to establish liability in a Bivens case, a plaintiff must specify the acts taken by the defendant which violate his constitutional rights.  See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.  See Zeitler v. Wainwright, 802 F.2d 391, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976).

**1) Defendants J. Caraway, Charles Williams, and Michael Weaver**

As a preliminary matter, the Fourth Circuit has held that non-medical supervisory personnel, like a warden, may rely on the opinion of medical staff regarding the proper medical treatment of inmates.  See Miltier, *supra* at 855. Accordingly, here, J. Caraway, as the Regional Director of the BOP's South Central Region,[5] Charles Williams, as the ex-warden, are not medical professionals, and they did not and should not substitute their own medical judgment for that of medical professionals. Thus, even assuming these supervisory defendants had notice of Plaintiff's administrative grievance regarding his medical needs, such notice does not rise to the level of personal involvement for liability in this suit. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995); Dunn v. Stewart, 2012 WL 6963923, *5 (N.D. W.Va. 2012); Sanders v. O'Brien, 2011 WL 2972089, *10 (N.D. W.Va. 2011); DeBerry v. Gilmer, 2010 WL 3937956, *6 (N.D. W.Va. 2010).

 Moreover, beyond a general conclusory allegation that Defendants Caraway, Williams, and Weaver were the "factual and proximate cause of all pain, suffering, emotional distress, mental

---

[5] See John Caraway, *available at* < https://www.bop.gov/about/agency/bio_scr.jsp >

anguish, deprivation of privileges and . . . permanent residual injury in his body," [ECF No. 1 at 9] Plaintiff has made no claim that Defendants Caraway, Williams, or Weaver were personally involved in the violation of his constitutional rights.  Instead, it appears that Plaintiff merely names them in their official capacities as the Regional Director, ex-warden, and the Health Services Administrator.  However, official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation and quotations omitted).  Nonetheless, in Miltier, 896 F.2d at 854, the Fourth Circuit recognized that supervisory defendants may be liable in a Bivens action if the plaintiff shows that: "(1) the supervisory defendants failed to provide an inmate with needed medical care; (2) that the supervisory defendants deliberately interfered with the prison doctors' performance; or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison physicians' constitutional violations."  In so finding, the Court recognized that [s]upervisory liability based upon constitutional violations inflicted by subordinates is based, not upon notions of *respondeat superior*, but upon a recognition that supervisory indifference or tacit authorization of subordinate misconduct may be a direct cause of constitutional injury." Id.

While Plaintiff's response in opposition appears to argue that Caraway, Williams, and Weaver should be "liable" because of their "causal link in administrative decisions" regarding his being scheduled for timely medical treatment [ECF No. 60 at 8], this appears to be an attempt to argue that their possible denial of his grievances implicates them in the denial of his constitutional rights; however, as previously noted, such does not rise to the level of personal involvement for liability in this suit. See Shakka v. Smith, 71 F.3d at 167.

A plaintiff cannot establish supervisory liability merely by showing that a subordinate was deliberately indifferent to his needs. Id.  Rather, the plaintiff must show that a supervisor's

corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practice. Id.  This Plaintiff has not done.  Accordingly, Defendants Caraway, Williams, and Weaver should be dismissed for failure to state a claim upon which relief can be granted.

**2) Rebecca Grove, Assistant Health Service Administrator**

Title 42 U.S.C. § 233(a) makes the FTCA the exclusive remedy for specified actions against members of the Public Health Service ("PHS"). In particular, it protects commissioned officers or employees of the PHS from liability for "personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions" by requiring that such lawsuits be brought against the United States instead. The United States thus, in effect, insures designated public health officials by standing in their place financially when they are sued for the performance of their medical duties. Cuoco v. Moritsugu, 222 F.3d 99, 109 (2nd Cir. 2000). See also United States v. Smith, 499 U.S. 160, 170 n. 11 (1990) (42 U.S.C. § 233 is one of several statutes passed to provide absolute immunity from suit for Government medical personnel for alleged malpractice committed within the scope of employment); Carlson v. Green, 446 U.S. 14, 20 (1980) (Congress explicitly provides in 42 U.S.C.§ 223(a) that the FTCA is a plaintiff's sole remedy against PHS employees); Apple v. Jewish Hospital and Medical Center, 570 F. Supp. 1320 (E.D.N.Y. 1983) (Motion for dismissal of the action against the defendant doctor, a member of the National Health Corps. granted and the United States substituted as defendant, and case deemed a tort action).

Therefore, pursuant to 42 U.S.C. § 233(a), Congress made proceedings under the FTCA the sole avenue to seek relief against any PHS employee for injuries resulting from the employee's performance of medical functions within the scope of his or her employment. The Supreme Court confirmed this rule in Hui v. Castaneda, by specifically holding that the immunity provided by

§233(a) precludes a <u>Bivens</u> action against individual PHS officers or employees for harms arising out of constitutional violations committed while acting within the scope of their office or employment. <u>See Hui</u>, 559 U.S. 799, 802 (2010).

Rebecca Grove is a Registered Nurse and the Assistant Health Services Administrator at FCI Gilmer, and at all times relevant to this action, she was a Commissioned Officer in the United States Public Health Service. ECF No. 50-8. Therefore, pursuant to 42 U.S.C. § 233(a), she is entitled to absolute immunity from suit for all claims arising from the medical care she provided the Plaintiff from April 17, 2015 when he first arrived at FCI Gilmer [ECF No. 50-1, ¶6 at 2], until he was released to the halfway house on or about April 6, 2018, and she should be dismissed from Plaintiff's lawsuit.

**3) <u>Eighth Amendment and Defendant Eddie Anderson, D.O.</u>**

Rotator cuff injuries are generally managed with conservative methods of treatment such as ice, rest, pain medications, steroid injections, and physical therapy, all of which were consistently provided to the Plainitff. Declaration of Eddie Anderson, D.O. ("Anderson Decl."), ECF No. 50-2, ¶ at 7. Surgery is not always appropriate to treat a rotator cuff tear and other, more conservative measures are typically used first before progressing to surgery. <u>Id.</u>

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991). Therefore, "the Eighth Amendment does not apply to every deprivation, or even every

unnecessary deprivation suffered by a prisoner, but *only* that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." Hudson v. McMillan, 503 U.S. 1, 20 (1970) (emphasis original).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).[6]

---

[6] The following are examples of what does or does not constitute a serious injury. A torn rotator cuff is a serious injury.  Fishback v. Depuy Orthopaedics, 2013 U.S. Dist. LEXIS 35562, * 28, 2013 WL 1010386 (D. Md. 2013); see also Oliver v. Pa Dep't of Corr., 2014 U.S. Dist. LEXIS 2368, *17-18, 2014 WL 80725 (E.D. Pa. 2014); Kostyo v. Harvey, No. 09-2509, 2010 U.S. Dist. LEXIS 93384, 2010 WL 3522449, at *8 (N.D. Ohio Sept. 8, 2010) ("Severe shoulder pain, including a possible rotator cuff tear, may qualify as a serious medical need."); Palmer v. Randle, No. 10-cv-718, 2011 U.S. Dist. LEXIS 64942, 2011 WL 2470062, at *4 (S.D. Ill. June 20, 2011) ("A torn rotator cuff . . . is the sort of chronic, painful condition that a layperson would find objectively serious."); Thomas v. Neves, No. 07-01249, 2010 U.S. Dist. LEXIS 39313, 2010 WL 1644789, at *3 (E.D. Cal. Apr. 21, 2010) (concluding that a rotator cuff tear is a serious medical need); Garbarini v. Ulit, No. 1:14cv01058, 2017 U.S. Dist. LEXIS 155631, Boone, S.A. (E.D. Cal. Sep. 22, 2017) *adopted by* Garbarini v. Ulit, No. 1:14cv01058, ECF No. 135, Ishii, A.W. (E.D. Cal. Oct. 20. 2017) *aff'd* Garbarini v. Ulit, 731 Fed. Appx. 708, 2018 U.S. App. LEXIS 20072, *1, 2018 WL 3470250 (9th Cir. July 19, 2018); Knight v. Shah, 2009 U.S. Dist. LEXIS 6210, *13 (S.D. Ill. 2009); Shaw v. Obaisi, 2015 U.S. Dist. LEXIS 17742, *9 (N.D. Ill. 2015); Williams v. Benson, 2016 U.S. Dist. LEXIS 84134, *15-*16 (N.D. Iowa 2016); *but see* Rosseter v. Annetts, 2012 U.S. Dist. LEXIS 139265, *30-*31 (N.D.N.Y. 2012)(no proof in the record beyond plaintiff's conclusory allegation his small rotator cuff tear found on MRI was a serious medical need, given physician's opinion that the tear would "probably" need repair "at some point," but plaintiff's claim of continued pain from the tear created a weak issue of disputed fact for summary judgment purposes); Wyatt v. Sundaram, No. 1:15cv895, 2017 U.S. Dist. LEXIS 167386 *12, *13, *15, Boone, S.A. (E.D. Cal. Oct. 10, 2017) (While a torn rotator cuff is a serious medical need, it is not a medical emergency; an MRI the day after injury was not medically necessary; conservative treatment such as rest, ice or heat, anti-inflammatory drugs, physical therapy and steroid injections are the usual recommended preliminary treatments, and several weeks to months may be required to get good results) *adopted by* Wyatt v. Sundaram, No. 1:15cv895, ECF No. 71, Drozd, D.A. (Feb. 13, 2018) *aff'd* Wyatt v. Sundaram, 744 Fed. Appx. 441, 2018 U.S. App. LEXIS 33877 (9th Cir. 2018).
    A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional  Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition.  Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference.  Wilson, 501 U.S. at 303.  A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).  A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials

---

(2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, e.g., Lepper v. Nguyen, 368 F. App'x. 35, 39 (11th Cir. 2010); Andrews v. Hanks, 50 Fed. Appx. 766, 769 (7th Cir. 2002); Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998); Beaman v. Unger, 838 F.Supp.2d 108, 110 (W.D. N.Y. 2011); Thompson v. Shutt, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); Mantigal v. Cate, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) report and recommendation adopted, 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); Johnson v. Adams, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); Bragg v. Tyler, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); Vining v. Department of Correction, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injury satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. Cokely v. Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

Here, even though Plaintiff's torn rotator cuff constitutes a serious medical need, thus satisfying the objective element, the medical records establish that he received substantial and adequate care.  Therefore, Plaintiff cannot satisfy the subjective element, and he fails to establish an Eighth Amendment violation.

While the entire history of Plaintiff's torn rotator cuff has been set forth, *infra*, to explain the course of his injury and treatment, Plaintiff's instant Bivens claims necessarily only involve the medical care after he arrived at FCI Gilmer on April 17, 2015.

At 7:30 pm on December 13, 2014, at USP McCreary, Plaintiff advised BOP medical staff that he had injured his right shoulder exercising earlier that evening. ECF No. 50-2 at 9.  He reported that he could not lift his shoulder, and had sharp pain that he described as a "6" on a scale from 0 – 10. Id. A nurse conducted a range of motion test, which caused Plaintiff to grimace, but she did not detect any asymmetry in the shoulder or feel any crepitus[7] when she examined it. Id. Plaintiff was given a sling for his arm and ibuprofen, a nonsteroidal anti-inflammatory drug ("NSAID"). Id. at 10. A right shoulder x-ray was ordered, and Plaintiff was instructed to follow up at sick call[8] needed. Id.

---

[7] Crepitus is an abnormal crackling or grating feeling or sound, which when detected in a joint, can indicate cartilage wear in the joint space. See Medical Definition of Crepitus, *available at* < https://www.medicinenet.com/script/main/art.asp?articlekey=12061 >

[8] Inmates may report to the Health Services Department during sick call. This allows inmates an opportunity to address any medical complaints with Health Services staff. The Bureau of Prisons ("BOP") uses a triage process during sick call: when inmates present to sick call, medical staff (typically nurses) evaluate them and classify them based on the

During a December 16, 2014 medication renewal/review evaluation, USP McCreary medical staff documented that a note from the psychologist indicated that Plaintiff reported that he "throws his BUSPAR[9] in the trash;" accordingly, Plaintiff was assessed as having a "history of noncompliance with medical treatment." Id. at 12.

A December 16, 2014 right shoulder x-ray was negative except for mild calcification[10] in the acromioclavicular ("AC") joint, which connects the collarbone to the shoulder. Id. at 13.

At 9:22 a.m. on December 23, 2014, a BOP Health Services Clinical Encounter Administrative Note was entered by Christopher Davis, APRN/FNP-C ("Davis"), reporting that a scheduled appointment at which Plaintiff was to come in to discuss his knee pain had to be cancelled because Plaintiff failed to appear. Id. at 14. Davis also noted that Plaintiff was not purchasing medication from the commissary; had recently refused a knee brace; and had attempted to divert Neurontin[11] in the past. Id. However, at 3:30 p.m. that day, Curtis was seen by Davis at USP McCreary's Health Services for a complaint of left knee pain. ECF No. 50-2 at 15.  He reported having had "sg on it in 1998 and in 2011,"[12] and that he had "[n]o number for the pain but it was bad." Id. Plaintiff also reported that his Neurontin had been discontinued in September

---

priority of need for treatment, allowing truly urgent conditions to be addressed the same day, and permitting more routine conditions to be addressed at scheduled appointments. During triage, inmates provide a brief history and vital signs are taken. Appointments are scheduled with appropriate providers within a time frame appropriate for the inmate's condition and medical needs. Every sick call visit is documented with a treatment note by the triage staff, and the note is then reviewed by a mid-level provider or physician. Declaration of Eddie Anderson, D.O. ("Anderson Decl."), ECF No. 50-2, ¶33 at 7.

[9] Buspar is an anti-anxiety drug.  See Buspar Tablet, *available at* < https://www.webmd.com/drugs/2/drug-9036/buspar-oral/details >

[10] Calcification indicates arthritis, which can cause pain and limit range of motion. Anderson Decl., ECF No. 50-2, ¶ 10 at 2.

[11] Neurontin (gabapentin) is an anti-seizure medicine often used to alleviate nerve pain. See Neurontin Capsule, *available at* < https://www.webmd.com/drugs/2/drug-9845-8217/neurontin-oral/gabapentin-oral/details >

[12] The undersigned presumes that from the context in which it was used, the abbreviation "sg" refers to "surgery."

and he was started on Pamelor[13] instead, but that the Pamelor was not as effective as the Neurontin; he was advised that because of his history of attempting to divert the Neurontin, it would not be prescribed; when queried regarding his recent Buspar diversion, he denied that it happened.  Id. He was observed being able to walk around the room without difficulty. Id. A different NSAID medication, Naproxen, was prescribed. Id. Plaintiff also reported that he had recently injured his right shoulder doing pushups but that his shoulder didn't need addressing because "someone looked at it last week." Id. He also reported that his irritable bowel syndrome ("IBS") had been acting up recently. Id. A left knee x-ray showed moderate degenerative joint disease; he was educated about arthritis; he asked about his brace; Davis noted that Plaintiff had previously refused the brace that was offered because it was not the same type he had had before and noted that an orthotic consult[14] was pending. Id.  Plaintiff's dicyclomine[15] prescription was increased from 20 mg tablets, to be taken two at a time, twice daily (for a daily total of 80 mg), to 60 mg twice daily (for a daily total of 120 mg) in capsule form, with the capsules to be opened, mixed with water, and given at pill line. Id. at 16.

On December 29, 2014, at 9:30 pm, Plaintiff emailed Health Services staff stating he was having a lot of shoulder pain, and to tell PA Davis that he needed an MRI on his shoulder.[16] ECF No. 50-3 at 16.

---

[13] Pamelor is a tricyclic antidepressant that is also sometimes prescribed for smoking cessation and some forms of nerve pain.  See Pamelor, *available at* < https://www.webmd.com/drugs/2/drug-1820/pamelor-oral/details >

[14] Orthotics is the branch of medicine that deals with provision and use of artificial devices such as splints and braces.

[15] Dicyclomine (Bentyl) is an antispasmodic/anticholinergic medication used to relieve the symptoms of irritable bowel syndrome.  See Bentyl, *available at* < https://www.rxlist.com/bentyl-drug.htm#indications >

[16] The undersigned notes that a copy of this email was not found within the other medical records produced by the Defendants; this email was attached to the copy of the Bivens complaint Plaintiff filed in the Eastern District of Kentucky, a copy of which was attached to Defendants' memorandum in support of its dispositive motion. ECF No. 50-3 at 16. Plaintiff also filed a copy of it, attached to the memorandum in support of his instant Bivens complaint, styled as "Resubmit Supplemental/Amended Complaint to Bring Federal Tort Claim Act Claim." This "memorandum

On December 31, 2014, Plaintiff was again seen by Davis in USP McCreary's Health Services[17] for a complaint of right shoulder pain unrelieved by heat. ECF No. 50-2 at 18.  Davis did not provide an assessment of Plaintiff's pain on a 0 – 10 pain scale, explaining "[i]nmate doesn't understand 0 – 10 scale." Id. He noted that Plaintiff's shoulder x-ray reflected calcification (i.e., arthritic changes), not an acute injury. Id. He conducted several range of motion tests to assess Plaintiff's shoulder; noted that Plaintiff could dress and undress himself without assistance; and had no visible shoulder deformity to indicate a fracture or dislocation. Id. Plaintiff's right arm had good pulse, movement, and sensation ("distal PMS"); he could elevate his shoulder to approximately forty-five (45) degrees before experiencing pain; and he had no crepitus, popping, or locking in his shoulder.  Id. The plan of care noted that it was "a fairly recent injury" and that Plaintiff was advised to use heat, NSAID medications, and range of motion ("ROM") exercises and to notify medical if it did not improve in a few weeks. Id.

On January 5, 2015, Health Services staff responded to Plaintiff's December 29, 2014 email to advise him that he had an appointment next month with his provider and could discuss his shoulder then. ECF No. 50-3 at 16.

On January 7, 2015 at 9:02 am, Davis made an Administrative Note regarding pharmacy staff's reporting that Plaintiff was complaining about his dicyclomine pills being emptied; noting that Plaintiff "is requesting specific formulation of medication" and that he already had "2 red flags" from the previous year for drug diversion. Id. at 20.  Davis noted Plaintiff did not want to take the dicyclomine four times daily; he was taking it twice daily, and that because of the "high

---

in support" appears to be the same memorandum in support, now labeled for filing in this court, that he filed in the Eastern District of Kentucky.  Cf. ECF No. 1-1 at 1 – 8 with ECF No. 50-4 at 1 – 8.

[17] Davis' note was made as a "late entry" on January 2, 2015.  See ECF No. 50-2 at 18, 19.

dicyclomine abuse in BOP and the fact that he wants it two times a day I think it is appropriate for it to be continued at pill line and capsules to be emptied."[18] Id.

On January 13, 2015, Davis made another Administrative Note in Plaintiff's BOP medical record, noting that Plaintiff had "been noncompliant at pill line with Dicylomine. 1 [sic] nurse noted that he refused bc [sic] they were opened." Id. at 21. Plaintiff's Dicyclomine was discontinued. Id. That same day, Plaintiff emailed Health Services staff again, stating in pertinent part

> I need to be seen about my shoulder[,] it have [sic] not inprove [sic] sent [sic] I hurt it four weeks ago it to [sic] much pain at night sense [sic] I hurt it[.] I cant [sic] sleep at night[;] the pain go right to my chest[.] I need to be seen now[.][19]

ECF No. 1-1 at 22. Health Services staff responded the next day, saying "[y]ou have an appointment scheduled next month with your provider. Watch the call outs." Id.

On January 16, 2015, Davis made another Administrative Note in Plaintiff's BOP medical record, reporting that he had spoken to Plaintiff through the pharmacy window, and Plaintiff wanted to get back on his old dose of dicyclomine. Id. at 22. Plaintiff was instructed to send Davis a "cop out."[20] Id.  Davis noted that he would follow up with Plaintiff if Plaintiff sent a cop out as instructed. Id.

---

[18] The reference to Plaintiff's dicyclomine capsules being "emptied" means that Health Service staff ensured that the dicyclomine capsules were opened and their contents emptied into water, for Plaintiff to drink down, preventing the possibility of his "cheeking" the capsules. "Cheeking" is the slang term for when inmates pretend to swallow their medications, particularly psychoactive drugs likely to be abused, but instead, secrete them in their cheek (hence the name) or elsewhere in their mouth, diverting them for later abuse or distribution to others.

[19] The undersigned notes that a copy of this email was also not found within the medical records produced by the Defendants; this email was attached to the copy of the Bivens complaint Plaintiff filed in the Eastern District of Kentucky, a copy of which was attached to Defendants' memorandum in support of its dispositive motion. Plaintiff also filed a copy of it, attached to the memorandum in support of his instant Bivens complaint, styled as "Resubmit Supplemental/Amended Complaint to Bring Federal Tort Claim Act Claim." See ECF No. 1-1 at 23.

[20] The BOP form BP-Admin-70, "Inmate Request to Staff," commonly called a "cop-out," is used to make a written request to a staff member.

On January 26, 2015, Plaintiff emailed Health Services staff again, stating

> I need to be put in for a MRI on my rigrt [sic] arm[;] I think I torn my rotator cuff in my shoulder[,] I been in a lot of pain for six week [sic] with out [sic] sleep because [of] the pain[;] it did not heal or get anying [sic] better I cant [sic] deal with the pain anying [sic] more[.][21]

ECF No. 1-1 at 23. On January 28, 2015, Health Services staff responded, advising that "[y]our provider has been notified of your concerns. You already have an appointment scheduled though." Id.

On February 13, 2015, Davis made an Administrative Note, documenting that he had agreed to re-start Plaintiff's Dicyclomine at his old dose (20 mg orally four times daily, in tablet form), but that "[i]f he is found to be abusing it will be stopped." Id. at 25.

While the Declaration of Eddie Anderson, D.O. contends that during the two and a half months between "December 31, 2014 and March 16, 2015, Plaintiff reported no further shoulder pain or problems [see ECF No. 50-2, ¶14 at 3 – 4]," it is apparent that Plaintiff did in fact complain of pain via the three emails sent during that time to USP McCreary Health Services staff on December 29, 2014 (answered on January 5, 2015); January 13, 2015; and January 26, 2015.

Nonetheless, on March 16, 2015, in a Chronic Care Clinic[22] ("CCC") encounter in USP McCreary Health Services, Plaintiff reported pain in his right shoulder that was interfering with

---

[21] The undersigned notes that a copy of this email was also not found within the medical records produced by the Defendants; this email was attached to the copy of the Bivens complaint Plaintiff filed in the Eastern District of Kentucky, a copy of which was attached to Defendants' memorandum in support of its dispositive motion. Plaintiff also filed a copy of it, attached to the memorandum in support of his instant Bivens complaint, styled as "Resubmit Supplemental/Amended Complaint to Bring Federal Tort Claim Act Claim." See ECF No. 1-1 at 23.

[22] Chronic care clinic is a method the BOP uses to manage the health care of inmates with chronic health conditions on a regular basis. Inmates enrolled in the  chronic care clinic program are seen by staff physicians on a regular basis for monitoring of their health conditions. Inmates are evaluated periodically anywhere from once each month   to once each year, depending on the complexity of their health conditions.
Inmates can also report any medical concerns or request treatment at any time by submitting a  written request to medical staff at the prison. Anderson Decl., ECF No. 50-2, ¶¶ 35 – 35 at 7 – 8.

his sleep. Id. at 36. USP McCreary Medical staff noted that his right shoulder had limited range of movement, and despite taking NSAIDs and doing physical therapy type exercises, he still reported pain on a level of 10 on a scale of 0 – 10; a recommendation was made for him to be referred to an orthopedic specialist. Id. at 41.

On March 18, 2015, the USP McCreary Utilization Review Committee[23] denied Plaintiff's orthopedic consultation request, concluding that more conservative treatment should be attempted first, before recommending Plaintiff for medical consultation with a non-BOP provider. Id. at 44.

At a March 30, 2015 Chronic Care Clinic encounter, *inter alia*, Plaintiff reported not sleeping well since December because of shoulder pain. Id. at 46. Davis noted that he had a limited ability to abduct his left [sic] arm. Id. at 47.

An April 6, 2015 BOP Health Services Inmate Intra-System Transfer form noted that among other things, Plaintiff currently had "temporary/acute" shoulder pain and that he was taking Naproxen 500 mg twice daily for pain. Id. at 50.

On April 17, 2015, Plaintiff arrived at FCI Gilmer. At a BOP health screening conducted by a Registered Nurse ("RN") that day, he denied any painful condition. ECF No. 50-2 at 68.  An alert in the records from USP McCreary noted that Plaintiff "cheeks meds" and had attempted to divert his gabapentin on April 9, 2014; further, he had admitted to psychology that he "trashe[d] his BUSPAR." Id. at 69.

On April 22, 2015, FCI Gilmer Staff Physician Eddie Anderson ("Anderson") saw Plaintiff for the first time as a new intake. Among other things, Plaintiff reported his complaint of right shoulder pain, reporting that he had injured it exercising in December 2013 and was supposed to get an injection but never did. Id. at 73. He reported having constant tearing/sharp pain in the

---

[23] The Utilization Review Committee independently assesses the urgency and necessity of inmate referrals into the community for medical evaluations and treatment. Anderson Decl., ECF No. 50-2, ¶ 16 at 4.

"anterior AC area" and being unable to abduct (lift straight out to the side) his arm much past the eighty (80) degree position. Id. He reported that the previously ordered NSAID pain medications and stretching had not provided relief. Id. at 78. Anderson made a provisional diagnosis of rotator cuff tear, ordered an MRI of Plaintiff's right shoulder, and scheduled an appointment for him to have a steroid injection in his right shoulder. Id.

On May 7, 2015, Plaintiff received a steroid injection of 80 mg methylprednisolone in his right shoulder for his complaint of "[c]hronic right shoulder pain, worse with abduction, deeper pain unable to clothe effectively." Id. at 83, 85.

On June 3, 2015, Plaintiff emailed Health Services to inquire about his gabapentin and dicyclomine prescriptions and ask when his MRI would be done. Id. at 88. He was seen in sick call on June 5, 2015 for cold symptoms. Id. at 90. On neither occasion did he mention shoulder pain.

Between June 23, 2015 and November 15, 2015, Plaintiff was evaluated, had medication adjustments, lab work ordered and drawn, and was assessed for medical duty status several times. Id. at 92 – 129. He did not mention shoulder pain.

On November 20, 2015, an unenhanced MRI of Plaintiff's right shoulder revealed a torn right rotator cuff, i.e., the supraspinatus tendon, which runs over the top of the ball of the shoulder joint, was fully torn, and he had tenosynovitis, or inflammation, of his bicep tendon. Id. at 132. Plaintiff's rotator cuff muscles had no atrophy (weakening or shrinking) or edema (fluid accumulation). Id. Further, the MRI report noted the same mild degeneration of his AC joint (which connects the collarbone to the shoulder) already seen on Plaintiff's December 2014 x-ray. Id. Anderson reviewed the MRI results on December 3, 2015, and requested that Plaintiff be referred to an orthopedic specialist. Id. at 134.

On December 21, 2015, the orthopedic consult was approved at a Utilization Review meeting. Id. at 351.

On March 17, 2016, Plaintiff emailed Health Services to ask about the status of his consult visit regarding his shoulder, stating he still had a lot of pain. Id. at 178. He was advised that the appointment had been made. Id.

Anderson evaluated Plaintiff again on March 21, 2016; Plaintiff requested a medication change back to naproxen, another NSAID, which caused less stomach irritation. Id. at 179 – 83. Anderson renewed Plaintiff's medications, discontinued Indomethacin and prescribed naproxen. Id. at 183.

On June 2, 2016, Plaintiff was evaluated by Freddie Persinger, D.O. ("Persinger") an orthopedic surgeon; Plaintiff told Persinger that he felt a pop in his right shoulder while lifting weights two years earlier. Id. at 188. Plaintiff reported that he had previously had a steroid injection which did help. Id. Persinger noted that Plaintiff "understands the nature of rotator cuff injury and needing to be addressed quickly." Id. Persinger examined Plaintiff's shoulder and found no atrophy, swelling, or redness, although Plaintiff had tenderness in his AC joint. Id. Persinger noted that Plaintiff had compensated well from the injury, had full range of motion, no instability, and demonstrated good flexibility and strength. Id. He reviewed Plaintiff's 2015 MRI and agreed that Plaintiff had torn his rotator cuff but noted that Plaintiff had no degenerative arthritis associated with the tear. Id. at 189. He gave injected Plaintiff with 80 mg. of Depo-Medrol 5 cc Marcaine in the right shoulder and suggested that Plaintiff continue the NSAIDs for pain. Id. Persinger noted that because the rotator cuff tear was chronic, he had advised Plaintiff that he would not recommend surgery. Id. Plaintiff was instructed to follow-up as needed. Id. On arrival back at FCI

Gilmer after the appointment that day, presumably because he had just received the steroid injection, Plaintiff denied any pain. Id. at 186.

From June 2, 2016 through October 14, 2016, Curtis reported no further pain or problem with his right shoulder. Id. at 192 – 205.  On October 14, 2016, Plaintiff emailed Health Services to report that he was having pain in his right shoulder again at night, asking to be put back on his Indomethacin; on October 19, 2016, Health Services staff responded and agreed. Id. at 206.

After March 22, 2017, although he was seen for various other issues, Plaintiff's medical records reveal no further complaints about his shoulder throughout the remainder of 2017; the records end in late December 2017.[24]

While the undersigned appreciates the fact Plaintiff sustained his injury on December 13, 2014 and an orthopedic consult was recommended on March 16, 2015 but denied on March 18, 2015, and that no MRI was done until November 12, 2015, it is apparent from the records that upon Plaintiff's first visit to Dr. Anderson on April 22, 2015, one week after his arrival at FCI Gilmer, Anderson immediately made a provisional diagnosis of torn rotator cuff, requested an MRI, and scheduled Plaintiff for a steroid injection in his shoulder to provide relief. ECF No. 50-2 at 78.  Plaintiff received the steroid injection on May 7, 2015. Id. at 85.  The MRI was performed on November 20, 2015 [id. at 130]; Anderson reviewed the MRI results on December 3, 2015 and immediately requested that Plaintiff be referred to an orthopedic specialist. Id. at 134.  Plaintiff was seen by the orthopedist Persinger on June 2, 2016; Persinger's record reflects that Plaintiff was given another steroid injection into the shoulder, and because the rotator cuff tear was chronic, was advised that "surgical fixation would not be indicated." Id. at 189.

---

[24] Defendants produced the records on March 19, 2018. See ECF No. 50. As previously noted, Plaintiff was released from FCI Gilmer to the halfway house on or about April 6, 2018. ECF No. 57.

To the extent that Plaintiff alleges that when he first saw Anderson, Anderson refused to prescribe him pain medication for the "severe pain in his right shoulder," and that Anderson never ordered anything more for pain until September 11 [sic], 2015, when Indomethacin was ordered, but that the Indomethacin was ordered for his knee problems, not for his shoulder [ECF No. 1 at 8], the undersigned notes that only one week earlier, at a BOP Health Screening on April 15, 2015, the day he arrived at FCI Gilmer, Plaintiff told the RN conducting the screening that he currently had no painful condition. ECF No. 50-2 at 68.  That RN also renewed all of Plaintiff's medications, among them was the NSAID Naproxen 500 mg, to be taken twice daily for pain. Id. at 71. Accordingly, when Plaintiff was first seen by Anderson a week later, he already had a prescription for an NSAID; and he received the first steroid injection into the shoulder fifteen days later.

While Plaintiff also claims that the May 7, 2015 steroid injection only relieved the pain for "a couple of hours and barely relieved the pain in his right shoulder [ECF No. 1 at 8]," this contradicts what Plaintiff told Persinger at the June 2, 2016 visit, where Plaintiff reported that he had previously had "one steroid injection in the past which did help." ECF No. 50-2 at 188. Further, while Plaintiff was seen by Health Services personnel repeatedly over the next ten months, he made no complaint of shoulder pain again after the May 7, 2015 steroid injection, until March 17, 2016, when he emailed Health Services to ask about the status of his orthopedic consult visit for his shoulder, stating that he still had a lot of pain.  ECF No. 50-2 at 178. This would seem to indicate that he did, in fact, get significant relief from the steroid injection.

As for Plaintiff's claim that the Indomethacin was ordered on September 11 [sic], 2015 for his knee pain, not his shoulder pain, the records of the September 10, 2015 visit show that the Indomethacin was started and the Naproxen discontinued [ECF No. 50-2 at 101] but the medication change was made at Plaintiff's own request with no mention of any pain at all, let alone

which pain (i.e., knee, wrist/hand, or shoulder) it was for. ECF No. 50-2 at 100.  The records are replete with mention of Plaintiff's chronic pain issues: a left knee, for which he had previous surgery for and wore a brace, as well as "chronic nerve damage" in his right hand/wrist from an injury in 2003, which caused "nerve pain." ECF No. 50-2 at 73. Nonetheless, Plaintiff's claim that the Indomethacin was not ordered to relieve shoulder pain is moot; pain medication does not discriminate by only relieving pain in one area of the body; when taken, it relieves pain anywhere in the body.

Plaintiff's claim that he "languished and suffered in pain off and on" from April 17, 2015 until February 28, 2017 (when he apparently drafted the instant Bivens complaint) is simply not supported by the records.  While there is no question that Plaintiff did suffer pain, the record also reveals long periods of time in which Plaintiff made no complaint of shoulder pain whatsoever.[25]

Plaintiff concludes that by the time he received the orthopedic consult with Dr. Persinger, he learned that "surgery would be useless" because of the delay in treatment, leaving him with a "permanent residual injury in his right shoulder."  ECF No. 1 at 9.  The undersigned notes that the copy of the July 31, 2018 letter from Uzoma Ukomadu, MD ("Ukomadu"), the orthopedic surgeon from Brooklyn, New York, that Plaintiff filed in an attempt to comply with the WVMPLA's requirement of a screening certificate of merit, suggests otherwise. See ECF No. 65. Ukomadu's letter indicates that his assessment of Plaintiff's condition was "[r]ight shoulder rotator cuff tear refractory to conservative treatment," and states in pertinent part that:

---

[25] Despite being repeatedly seen for other reasons by Health Services during these times, Plaintiff made no complaint of right shoulder pain  for the one month and almost three weeks between January 26, 2015 and March 16, 2015; for the ten months and one+ weeks between May 7, 2015 through March 17, 2016; for the four and a half months between June 2, 2016 through October 14, 2016; for the five months and one week between October 14, 2016 through March 22, 2017; and for the nine months between March 22, 2017 through late December, 2017, when the records end.

While still at USP McCreary, Plaintiff was seen in Health Services for his knee problem on December 23, 2014, only ten days after he injured his shoulder; he advised Health Service staff that he had recently hurt his right shoulder as well, but that the shoulder didn't "need addressing" because "someone looked at it last week [ECF No. 50-2 at 15];" this is hardly consistent with someone experiencing severe, debilitating pain.

I discussed with Melvin the treatment options available. **He did express interest in scheduling surgery as soon as possible, but also expressed the need to start working. Gaining employment was a goal that is important in order to secure a long-term housing for himself. I told Melvin that while a brief delay in surgical treatment would not be likely detrimental, it would be ideal to address his pathology soon. I did also mention to Melvin that because of the chronic nature of the tear, it is possible that from a surgical standpoint it might not be repairable**. We did review his MRI and it did show a full-thickness tear with retraction and an equivocal amount of muscle atrophy. I also mentioned to Melvin that had this been repaired acutely that he likely would have had a higher possibility of a successful outcome. **Nonetheless, Melvin did decide that he will return to the office in approximately six weeks in order to discuss the scheduled surgery**. I did also refer Melvin to neurology in order to consider EMG/NCV testing for his right upper extremity in order to assess the extent of the nerve damage in his arm secondary to a laceration that he sustained many years ago.

ECF No. 65 at 2 (emphasis added). It appears, then, that while Plaintiff blames Dr. Anderson and others for their failure to timely arrange for the surgical repair of his shoulder, that he continues to postpone the repair himself, even when given the opportunity to have it done.[26]

Nonetheless, Anderson cannot be faulted for the unfortunate four-month delay in diagnosing Plaintiff's injury before Plaintiff arrived at FCI Gilmer. Plaintiff's criticisms of the care Anderson provided, which began after that, do not prove deliberate indifference, but prompt, reasonable, and appropriate attempts to diagnose Plaintiff's problem, and treat and/or relieve his pain. Plaintiff's claims to the contrary are not supported by the record, or by case law. See Wyatt v. Sundaram, No. 1:15cv895, 2017 U.S. Dist. LEXIS 167386 *12, *13, *15, Boone, S.A. (E.D. Cal. Oct. 10, 2017) (While a torn rotator cuff is a serious medical need, it is not a medical emergency; an MRI the day after injury was not medically necessary; conservative treatment such as rest, ice or heat, anti-inflammatory drugs, physical therapy and steroid injections are the usual recommended preliminary treatments, and several weeks to months may be required to get good

---

[26] It is unclear from the record whether Plaintiff has ever had this surgery performed.

results) *adopted by* <u>Wyatt v. Sundaram</u>, No. 1:15cv895, ECF No. 71, Drozd, D.A. (Feb. 13, 2018)

*aff'd* <u>Wyatt v. Sundaram</u>, 744 Fed. Appx. 441, 2018 U.S. App. LEXIS 33877 (9th Cir. 2018).

While Plaintiff's response in opposition to the Defendants' dispositive motion attempts to

argue that three "Fourth Circuit [sic]" cases support his position that this Court should decide that

his MRI and surgical repair were unreasonably delayed[27] [ECF No. 60 at 5 – 6], all three of the

cases he cites to are appeals from denials of  Social Security Act ("SSA") determinations by

applicants who were not incarcerated federal prisoners; because they are not prisoner civil rights

cases, they are inapposite here.

"Prisoners are not entitled to the "best medical care money can buy." <u>Burns v. Smith</u>, No.

3:08cv428, 2009 U.S. Dist. LEXIS 79525, *7-*8, Hayes, K.L. (W.D. La. July 16, 2009) *adopted*

*by* <u>Burns v. Smith</u>, 2009 U.S. Dist. LEXIS 79492,  James, R.G.(W.D. La. Sep. 2, 2009) (quoting

<u>Mayweather v. Foti</u>, 958 F.2d 91 (5th Cir. 1992); <u>Woodall v. Foti</u>, 648 F.2d 268 (5th Cir. 1981)).

In <u>Woodall</u>, the Fifth Circuit stated that the test in balancing the needs of the prisoner versus the

needs of the detention center is one of medical necessity, not of desirability. <u>Woodall</u>, *supra*. The

fact that a plaintiff does not believe that his medical treatment was as good as it should have been

is not a cognizable complaint under the Civil Rights Act. It appears, then, that Plaintiff merely

disagrees with the care he received. "Disagreements between an inmate and a physician over the

---

[27] <u>See</u> <u>Hix v. Colvin</u>, No. 1:16cv1252, 2017 U.S. Dist. LEXIS 22119, *3 - *4, Hodges, S.V. (D.S.C. Jan. 4, 2017)(thirty days between evaluation, MRI, and surgical repair) *adopted by* <u>Hix v. Berryhill</u>, 2017 U.S. Dist. LEXIS 21312, Lewis, M.G. (D.S.C. Feb. 15, 2017); <u>Moss v. Colvin</u>, No. 5:16cv47, 2017 U.S. Dist. LEXIS 96498, *9 - *10, Trumble, R.W. (N.D. W.Va. May 26, 2017) (nineteen days between evaluation, MRI, and surgical repair) *adopted by* <u>Moss v. Comm'r of SSA</u>, 2017 U.S. Dist. LEXIS 95569, Stamp, F.P. (N.D. W.Va. June 21, 2017); <u>Taylor v. Colvin</u>, No. 7:15cv494, 2017 U.S. Dist. LEXIS 37884, *6 - *7, Ballou, R.S. (W.D. Va. Jan. 26, 2017) (six months between evaluation, MRI, and surgical repair) *adopted by* <u>Taylor v. Berryhill</u>, 2017 U.S. Dist. LEXIS 37556, Dillon, E.K. (W.D. Va. Mar. 16, 2017).

inmate's proper medical care do not state a [Bivens] claims unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Moreover, courts should not "second-guess the propriety or adequacy of a particular treatment. Along with all other aspects of health case, this remains a question of sound professional judgment." Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977) (disagreements regarding the course of treatment do not establish an Eighth Amendment violation). Finally, "[o]nly the 'unnecessary *and wanton* infliction of pain' implicates the Eighth Amendment." Wilson v. Seiter, 501 U.S. 294, 297 (1991) (emphasis original).

Here, the Plaintiff only alleges that his medical care was inadequate. "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 106 (quotations omitted). Therefore, the Plaintiff cannot establish deliberate indifference in violation of his Eighth Amendment rights, and this claim should be dismissed as to Anderson.

## C. **Plaintiff's FTCA Claims**

### **Medical Negligence**

To the extent that a plaintiff seeks to establish a medical negligence claim, he must comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate

cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code § 55-7B-6. This section provides in pertinent part:

> **§ 55-7B-6**. Prerequisites for filing an action against a health care provider; procedures; sanctions.
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.
>
> (b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the Rules of Civil Procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp. 2d 805, 806-807 (N.D. W.Va. 2004).[28]

---

[28] In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury. The Court found that there was no conflict between the state pre-filing requirements and the pre-filing requirements of the FTCA. More specifically, the Court concluded that the West Virginia pre-filing requirement is 'substantive' [and] there is no conflict to be resolved between the federal and state pre-filing requirements. Although § 55-7B-6 is

Plaintiff's response in opposition to the Defendant's dispositive motion contends that the Defendant's summary judgment motion should be denied because he is entitled to the common knowledge exception of W.Va. Code § 55-7B-6(c), thus relieving him of the requirement of filing a screening certificate. Id. at 3, 7.  In purported proof of the permanence of his injury, he references orthopedic surgeon Persinger's June 2, 2016 note which states that because his injury was already "chronic," surgical fixation would not be indicated.  Id. at 3. He further contends that the dismissal order from the Eastern District of Kentucky stated in a footnote that his "claims in West Virginia have merit in the treatment in his West Virginia claim."[29] Id. at 5. He cites to the three "Fourth Circuit [sic]" cases noted *supra*, which he alleges support his position that this Court should decide that his MRI and surgical repair were unreasonably delayed. Id. at 5 – 6. For the first time, he elaborates on his claim of "ordinary negligence," explaining that "when a claim arises out of policy, management, or administrative decisions, then the claims sound[] in ordinary negligence[.]" Id. at 7.

Finally, he attaches a sworn affidavit, contending that during this June 2, 2016 visit with Dr. Persinger, "escort transit officer Mahoney," who accompanied him to the visit, "informed me that I have a lawsuit" and that "he would testify for me to what the Doctor said." ECF No. 60-1 at 1. Further, he attests that he has suffered "continual off and on substantial pains" from his injury, which interfere with raising/lowering his arm, sleeping, and his ability to work, causing emotional distress.  Id. at 2.

---

more demanding [than] 28 U.S.C. § 2675(a) and its implementing regulations, there is nothing to prevent a plaintiff from complying with both requirements." Stanley, 321 F.Supp.2d at 808-09.

[29] The undersigned notes that the only footnote in the December 6, 2017 Memorandum Opinion and Order from the Eastern District of Kentucky makes no such claim.  See ECF No. 50-6, n1 at 2 – 3.

Here, Plaintiff alleges that BOP staff, including BOP staff at FCI Gilmer, were negligent[30] and committed medical malpractice by not timely providing an MRI and surgical repair, until his shoulder problem was considered "chronic" and therefore unrepairable. ECF No. 16 at 7. While Plaintiff argues that his torn rotator cuff injury falls within the "common knowledge exception" of W.Va. Code 55-7B-6(c) [id. at 8], the undersigned agrees with the Defendant that Plaintiff's claim that FCI Gilmer's Health Services staff failed to timely diagnose and treat his torn rotator cuff is a complex medical issue which requires that a screening certificate of merit be filed.   In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D. W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Id. at 858 (all spelling and punctuation errors in original).[31]

Unlike the facts in Johnson, Plaintiff's allegations of medical negligence are complex and expert testimony is necessary. See O'Neil v. United States, 2008 WL 906470 (S.D. W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit because

---

[30] While Plaintiff's complaint alleges that the BOP employees  committed "ordinary negligence" as well as medical malpractice,  beyond an unclear statement regarding the delays in his diagnosis and  treatment impliedly being "basic administrative duties by prison official's [sic] named herein[,] [ECF No. 16 at 8]" Plaintiff's allegations only describe medical negligence, not "ordinary" negligence, and thus, they will be addressed  as such here.

[31] Johnson is a rare exception to "the general rule that in medical practice cases negligence or  want of professional skill can be proved only by expert witnesses." See Banfi v. Am. Hosp. for  Rehab., 529 S.E.2d 600, 605 (W.Va. 2000). A court shall require expert testimony except where the "lack of care or want of skill is so gross, so as to be apparent, or the alleged breach relates  to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience…" Id. at 605-606.

the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience); see also Lancaster v. Hazelton, 2018 U.S. App. LEXIS 20836, *1 (4th Cir. Jul. 26, 2018) (*per curiam*) (affirming this court's dismissal of his FTCA medical negligence claims for his failure to file the required screening certificate of merit, pursuant to W. Va. Code § 55-7B-6(b) prior to filing his medical negligence claim).

Expert testimony is necessary to support a finding that the medical treatment provided by FCI Gilmer's Health Services staff fell below the applicable standard of care. The undersigned finds that the symptoms, methods of prevention, and proper treatment options for treatment of a torn rotator cuff are not within the understanding of lay jurors by resort to common knowledge and experience. Further, neither is the alleged causal connection in the delay of the testing and the injuries alleged.

With regard to the appropriate standard of care, Plaintiff has not sustained his burden of proof. Plaintiff does not assert, much less establish, the standard of care for his torn rotator cuff. Although he did eventually file a copy of the July 31, 2018 letter from his treating orthopedic physician, Dr. Ukomadu, one year, five months and three weeks after filing suit, attempting to meet the MPLA requirement of a screening certificate of merit, Ukomadu's letter does not meet the standard for W.Va. § 55-7B-6(b). Ukomadu's "to whom it may concern" letter was not executed under oath; it does not state Ukomadu's familiarity with the applicable standard of care, nor does it even attempt to opine as to what the applicable standard of care for a torn rotator cuff is, or how it was breached, to cause Plaintiff's injury. The letter is merely an opinion on the then-current status of Plaintiff's shoulder and Ukomadu's suggestions for treatment:

> I had the pleasure of seeing Melvin Curtis in the office today for followup [sic] evaluation of his right shoulder pain. I have seen Mr. Curtis as a patient since his

initial visit on June 13, 2018. He has had multiple-year history of shoulder pain that per his history started in 2014.  He mentioned having had a full range of conservative treatment for what he described as a right shoulder rotator cuff tear including physical therapy, multiple injections, and antiinflammatories with persistent pain.  At his last visit, we did obtain x-rays as well as order an MRI with instructions for Melvin to follow up today for a definitive treatment planning.

**Intercurrent History**: Mr. Curtis states that his pain has not improved since his last visit in June 2018 and he did not see any benefit with physical therapy. He did, however, obtain the MRI.

**Physical Exam**:  Focused musculoskeletal examination of bilateral shoulders was undertaken, which is notable for Mr. Curtis having 130 degrees of forward flexion on the right side compared to 140 degrees on the left.  He had abduction of 85 degrees on the right compared to 90 degrees on the left.  Internal rotation is to L4 on the right compared to L2 on the left and external rotation of 60 degrees bilaterally.  He had no signs of deformity or tenderness to palpation and his neurovascular status was grossly intact.

**Radiology Review**
We did review the MRI of the right shoulder, which was obtained on July 7, 2018, and notable for the following impression including:
1. Full-thickness tear of the anterior to mid fibers of the rotator cuff.
2. Mild long head of biceps tendon degenerative changes.
3. Moderate acromioclavicular osteoarthritis.
4. Mild glenohumeral osteoarthritis.
5. Heterogeneous marrow signal which could be secondary to red marrow conversion in the setting of anemia; however, other etiologies cannot be excluded.

**Assessment**
Right shoulder rotator cuff tear refractory to conservative treatment.

**Plan**
I discussed with Melvin the treatment options available. He did express interest in scheduling surgery as soon as possible, but also expressed the need to start working. Gaining employment was a goal that is important in order to secure a long-term housing for himself. I told Melvin that while a brief delay in surgical treatment would not be likely detrimental, it would be ideal to address his pathology soon. I did also mention to Melvin that because of the chronic nature of the tear, it is possible that from a surgical standpoint it might not be repairable. We did review his MRI and it did show a full-thickness tear with retraction and an equivocal amount of muscle atrophy. I also mentioned to Melvin that had this been repaired acutely that he likely would have had a higher possibility of a successful outcome. Nonetheless, Melvin did decide that he will return to the office in approximately six weeks in order to discuss the scheduled surgery. I did also refer Melvin to neurology in order to consider EMG/NCV testing for his right upper extremity in

order to assess the extent of the nerve damage in his arm secondary to a laceration that he sustained many years ago.

ECF No. 65 at 1 – 2.  Accordingly, Plaintiff has failed to comply with the mandatory pre-filing requirements of W.Va. Code §55-7B-6 and this claim should be dismissed.

## C. Defendants' Motion to Reconsider Order Granting Additional Time to File a Screening Certificate of Merit

On July 12, 2018, Plaintiff moved for an extension of time in which to file a screening certificate of merit.  ECF No. 61.  By Order entered July 13, 2018, the motion was granted.  ECF No. 62.  On July 17, 2018, Defendant moved for reconsideration, arguing that a screening certificate of merit is a prerequisite to filing suit against a medical provider, and that by seeking additional time in which to provide a screening certificate of merit, Plaintiff is "essentially seeking to revive a procedurally defunct medical negligence lawsuit by circumventing a mandatory prerequisite" that he was statutorily required to provide before filing suit.  ECF No. 63 at 1 – 3.

As a preliminary point, the undersigned notes that within this district, it is not unusual for such extensions to be granted. See Giambalvo v. United States, 1:11cv14 (Order Adopting in Part Report and Recommendation ("R&R") and granting leave to obtain screening certificate of merit within 90 days [ECF No. 65]; Order granting unopposed motion to extend time to file screening certificate of merit [ECF No. 71]; see also the screening certificate of merit, filed by appointed counsel. ECF No. 72.

In Giambalvo, this Court found that the *pro se* plaintiff's failure to satisfy the pre-suit requirements of W.Va. Code § 55-7B-6 did not warrant dismissal of his case because while "some district courts have held that the requirements of § 55-7B-6 are substantive rather than procedural, and have dismissed cases where the plaintiff failed to file a certificate of merit," that Westmoreland v. Vaidya, 664 S.E.2d 90, 96 (W. Va. 2008), a then-recent opinion by the Supreme Court of

Appeals of West Virginia concluded otherwise. In Westmoreland, the West Virginia Supreme Court of Appeals ("WVSCA") considered the statutory purposes of § 55-7B-6 and held that a plaintiff's noncompliance with the pre-suit requirements of § 55-7B-6(b) constituted a procedural defect that did not warrant dismissal of his case. The WVSCA noted that that the two-fold intent of the MPLA was to prevent the filing of frivolous law suits and to promote the pre-suit resolution of non-frivolous medical malpractice claims. Therefore, it observed that "a principal consideration before a court reviewing a claim of insufficiency in a notice or certificate should be whether a party challenging or defending the sufficiency of a notice and certificate has demonstrated a good faith and reasonable effort to further the statutory purposes." Westmoreland at 96. The WVSCA found it significant that Westmoreland had proceeded on a good faith belief that he could litigate his case under the common knowledge exception contained in subsection 6(c); accordingly, it concluded that Westmoreland's failure to file a certificate of merit was a procedural error, and that he should be afforded a reasonable amount of time to fulfill the statutory pre-suit requirements prior to dismissal of his case. Westmoreland at 96, 97.

Like the plaintiff in Westmoreland, this Court found that plaintiff Giambalvo, a *pro se* federal inmate, had demonstrated "a good faith and reasonable effort" to comply with the requirements of § 55-7B-6 by his filing of a document titled "In Lieu of Medical Screening Certificate of Merit," showing that he believed, albeit erroneously, that his medical negligence claim was based upon a well-established theory of liability that entitled him to rely on the common knowledge exception in subsection 6(c). Therefore, this Court concluded that to dismiss Giambalvo's complaint based upon a misunderstanding of his procedural obligations would constitute "a severe sanction which runs counter to the general objective of disposing cases on the merit." See Giambalvo, ECF No. 65 at 13 – 15, (quoting Westmoreland at 97, citing Dimon v.

Mansy, 479 S.E.2d 339, 344-45 (W. Va. 1996)). Therefore, this Court reasoned that Giambalvo should be afforded a reasonable opportunity to comply with the pre-suit requirements of § 55-7B-6.

Further, in Rhine v. United States, 5:12cv6, an Order was entered, *inter alia,* granting plaintiff's motion to extend the time to file a screening certificate of merit. ECF No. 22.

In Jacobs v. United States, 1:13cv164, a screening certificate that was untimely filed with objections to the first R&R was accepted, and an extension of time was granted in which to file an amended screening certificate of merit. See ECF Nos. 19-3 at 3, 29 at 2, 31, 32 in that case.

Further, in Jones v. United States, 1:15cv50, a Memorandum Opinion and Order was entered, granting plaintiff's motion for reconsideration, vacating in part the Order adopting R&R, reopening the case, and granting the *pro se* plaintiff an extension of time to file screening certificate of merit [ECF No. 190 at 5 – 9, 11]; see also Order Granting Motion to Withdraw as Counsel and Denying Plaintiff's Motions for Replacement Counsel (acknowledging that "[t]he undersigned fully appreciates that a *pro se* litigant, especially one who is incarcerated, will find it difficult to secure a screening certificate of merit without the assistance of a lawyer." ECF No. 208 at 2. On November 9, 2018, another extension of time was granted for the *pro se* plaintiff in that case to produce a screening cert of merit. See ECF No. 209.

Finally, an Order granting an extension of time to file a screening certificate of merit was also entered in Pledger v. Lynch, 2:16cv83; see ECF No. 44 in that case.

Here, given that Plaintiff, a *pro se* litigant, filed his complaint believing he was entitled to the common knowledge exception of W.Va. Code § 55-7B-6(c), he was likewise afforded a reasonable amount of time to comply with § 55-7B-6(c)'s pre-suit requirements, and granted an extension of time to produce a screening certificate of merit.  As it is apparent that the letter

44

Plaintiff ultimately filed from his orthopedic surgeon did not meet the standard, the undersigned recommends that Defendant's motion for reconsideration [ECF No. 63] be denied as moot.

## VII. <u>Recommendation</u>

For the reasons stated above, the undersigned hereby recommends that Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No. 49] be **GRANTED.** The undersigned further recommends that Plaintiff's <u>Bivens</u> complaint [ECF No. 1] be **DISMISSED with prejudice** and Plaintiff's FTCA complaint [ECF No. 16] be **DISMISSED without prejudice,** both for the failure to state a claim upon which relief can be granted.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made. Objections shall identify each portion of the magistrate judge's recommended disposition that is being challenged and shall specify the basis for each objection.  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. §636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, at his last known address as reflected on the docket, and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court.  The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED: January 28, 2019

/s/ *Michael John Aloi*

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE